[Civ. No. 683.    Third Appellate District.—April 1, 1910.]

## IRA HILL REED, Respondent, v. JOHN J. HICKEY and CHARLES LAMB, Appellants.

OPTION TO PURCHASE MINE—ACCEPTANCE—PART PAYMENT—DEED IN ESCROW—CESSATION OF OPTION—ENFORCEABLE CONTRACT.—Under an option to purchase a mine upon specified terms, permitting the holders thereby to prospect the mine for the vendor's benefit during the option, upon the acceptance of the terms of purchase specified and payment of part of the purchase money, and procuring the deposit of a deed in escrow to be delivered upon full payment, and the taking of full possession under the contract for the sole benefit of the purchasers, all option has fully ceased, and there is no continuing option as to deferred payments; but the vendor may enforce the residue of the purchase price, and upon full enforcement and payment thereof, the purchasers are entitled to the delivery of the deed placed in escrow.

ID.—EXECUTION OF CONTRACT BY VENDOR ALONE—PURCHASERS BOUND BY ACTS OF ACCEPTANCE.—It does not follow because the plaintiff, as vendor alone, executed the contract that it is not binding upon the defendants as purchasers. The contract being an agreement to sell upon the exercise of the option to purchase, the acts of defendants in making payments and taking full possession under the contract constituted a sufficient acceptance of its terms, and defendants became bound by it. The further signing of a supplemental agreement by an agent for the defendants evidenced a further acceptance of the contract by the defendants.

ID.—MUTUALITY OF REMEDY NOT REQUIRED.—Mutuality of contract does not require that there should be mutuality of remedies under it. Defendants could not by their depriving themselves by this breach of contract of the right to enforce a specific performance thereof deprive plaintiff, who had not broken the contract, of his right to enforce payment of the purchase money in full.

ID.—REMEDY TO REPOSSESS MINE NOT EXCLUSIVE.—The plaintiff was not confined to his remedy of repossessing the mine, upon defendants' breach, and after defendants have extracted a large quantity of gold from it, to its possible exhaustion.

APPEAL from a judgment of the Superior Court of Calaveras County, and from an order denying a new trial. N. D. Arnot, Judge.

The facts are stated in the opinion of the court.

Solinsky & Wehe, John Hancock, and S. C. Denson, for Appellants.

Nicol & Orr, M. H. Orr, Snyder & Snyder, and Ira Hill Reed, for Respondent.

CHIPMAN, P. J.—This is an action to recover the balance of the consideration mentioned in a certain contract for the sale of certain placer mining property situated in Calaveras county. Plaintiff had judgment, from which and from the order denying their motion for a new trial defendants appeal. The question now here rests chiefly upon the interpretation to be given to the agreement in the light of the circumstances surrounding the parties and their conduct and acts at the execution of the agreement and subsequent thereto.

It is set forth in the complaint that on April 29, 1907, and for many years prior thereto, plaintiff was the owner of the property in question, called the Reed Drift mine; that on that day one J. E. King was and had been the agent of defendants in negotiating for a contract for the sale and purchase of said mine, and upon that day plaintiff entered into an agreement in writing with said King, for said defendants, the material provisions of which are as follows: Reciting the fact of plaintiff's ownership and setting forth a description of the mine; the contract recites that second party "is desirous of an option to purchase said property for the agreed purchase price of $36,000, based upon the privilege of sixty days from date in which to prospect by sinking a shaft from the surface and drifting therefrom to ascertain the course and extent of the lead on which said party of the first part is now breasting and milling the gravel taken out." It is then provided that in consideration of the faithful performance of the terms of the contract by the second party, as thereinafter set forth, first party "covenants and agrees to sell and convey the said Reed mine to said party of the second part, at any time within said sixty days from the date of these presents, upon payments and conditions as follows." These conditions provide for a payment of $10,000 on or before June 29, 1907; $6,500 to be paid on or before September 29, 1907; $6,500 on or before December 29, 1907; $6,500 on or before March 29, 1908, the full and final payment of $6,500

to be paid on or before June 29, 1908. The contract then fixes the point upon the mine at which the prospecting shaft is to be sunk, and provides that "until the expiration of the sixty days' option hereby granted the right to continue the uninterrupted working and operating of said mine by said party of the first part and to the proceeds of the gravel taken out is agreed to, and that the said privilege of prospecting by said party of the second part shall in no manner interrupt or interfere with the working of said mine by said party of the first part"; and "all pay gravel taken out by the party of the second part while prospecting during the said period of sixty days shall belong to said party of the first part"; that all buildings, improvements and appliances placed upon the premises by second party "during said period of sixty days granted for prospecting" are to belong to said first party upon failure of second party to make the first payment provided for. It is then provided that upon payment of the first installment within said period of sixty days from date, first party will at once make and execute a good and sufficient conveyance of said mine, and deposit the same in escrow with the Bank of California, with instructions to hold the same during the life of the said agreement and deliver the same upon "payment of the balance of said purchase price at the times as herein stipulated, but if default be made in making any of said payments, or any violation of the terms or conditions of this agreement, to return said deed to the party of the first part." It was further agreed that upon receipt of the first payment, party of the first part "will at once turn over and surrender possession of said property to said party of the second part with the hoist, mill and all tools and appliances owned by him and heretofore used in working said mine; . . . and thereupon said party of the second part shall have the right and privilege of entering upon and into said Reed mine and of mining, prospecting and developing the same, and of taking out and working the gravel or any other mineral deposit, and extracting the gold contained therein for his own use and benefit." It is next provided that second party shall do the prospect work in a good and workmanlike manner at his own cost and expense, and contains certain provisions for protecting first party against liens or unpaid labor and materials. The contract also gives to the first party the privi-

lege of access to the mine and mill in order that he may know the character of the work being done and the extent of the pay gravel extracted. Time is expressly made the essence of the agreement, and it is provided "that a default in payment of either or any of the installments of said purchase price at the times and in the manner stated, or the failure to make monthly payments of the operating expenses in working said mine or to file with the party of the first part, on the tenth day of each month, a statement of such running expenses with vouchers, within a reasonable time thereafter, showing the payment thereof, shall at once abrogate this agreement, and its provisions shall no longer bind the party of the first part, and he may at once re-enter and assume possession and control of the whole of said described mining property, together with any and all machinery, buildings, tools, lumber, material, appliances and improvements either made or placed thereon by said party of the second part, and the same together with all payments of money on account of said purchase price shall be forfeited to said party of the first part as liquidated damages for the use and occupation of said property, . . . and all such machinery, buildings, tools, lumber, materials, appliances and improvements together with any and all such payments made of said purchase price shall revert to and belong to said party of the first part without legal recourse by said party of the second part."

It is averred that said King entered into said contract with plaintiff "as the representative of defendants and for them and as their agent, and he, said King, immediately after the execution of said contract, assigned and transferred all right therein and interest thereto to said defendants Hickey and Lamb; and they, said defendants Hickey and Lamb, thereupon entered into and upon said mine and commenced prospecting therein"; that on May 18, 1907, defendants notified plaintiff of their exercise of the option to purchase said mine at the price of $36,000, payable to plaintiff in installments, at the times and in the amounts as in the said agreement specified, and on that day paid to plaintiff on account of said purchase price the sum of $10,000, and then demanded that plaintiff at once make and execute to them a deed of the said mine and deposit the same with the Bank of California, with instructions to hold said deed during the life of the agree-

ment and to deliver the same to the defendants upon the payment made at said bank of the balance of said purchase price; that on said day, in response to said demand of defendants and in compliance with said agreement, plaintiff did make, execute and duly acknowledge a good and sufficient deed of said mine to defendants, and deposit said deed with said bank with instructions to deliver the same to defendants upon the payment of the balance of said purchase price, as provided in said agreement, and said deed has ever since been, and is now in and held by said bank under said instructions, ready for delivery to defendants upon the payment of the remainder of said purchase price; that upon said day plaintiff and defendants entered into an agreement in writing supplementary to the agreement hereinbefore set forth, by which it was agreed that plaintiff should remove all encumbrances upon said mine on or before September 29, 1907, and that if all such encumbrances were not so removed, the defendants should not be obligated to pay the second installment, or any other installments, until the title to said mine was clear of encumbrances, and it is averred that plaintiff did, prior to September 29th, cause to be removed from said premises all encumbrances, and the title thereto was on that day, and ever since has been and still is, clear of all encumbrances. It is next averred that on May 18, 1907, defendants entered into full and sole possession of all of said mine and commenced active mining operations therein, and so continued in the possession and the mining thereof, and during such mining operations extracted gold-bearing deposits therefrom of the value of upward of $40,000, all of which defendants appropriated to their own use, and that upon August 29, 1907, defendants paid to plaintiff, upon said purchase price of said mine, the further sum of $6,500, and that no other payments on account of said purchase price have been made, and there is unpaid the sum of $19,500.

All the foregoing averments of the complaint are found by the court to be true, except it is found that the amount of gold extracted from the mine by defendants was $33,540.55, and in that connection the court found that defendants had expended the sum of $23,069.45. The date of the second payment is found to have been September 29th, instead of

August 29th, as averred and as provided by the said agreement.

It was further alleged and found by the court that defendants promised and agreed to pay plaintiff the said purchase price in installments of the amounts and at the times specified in said agreement of April 29, 1907; that subsequent to said date, at the request of defendants, plaintiff in writing extended the time for the payment of the third installment from December 29, 1907, to January 28, 1908, but defendants failed and refused to pay said sum on or before said January 28th, and have since refused to pay said sum, or any part thereof. That defendants continued in sole possession of the mine and extracting gold-bearing deposits therefrom until January 28, 1908, at which date they suspended mining operations and notified plaintiff that they refused to pay said sum of $6,500, payable, as aforesaid, on January 28th, and refused to proceed with said agreement or to keep or perform its terms, or to make plaintiff any further payments on account of the unpaid purchase price of said mining claim; that on said twenty-eighth day of January defendants suspended work, and attempted to surrender possession of the mining claim to plaintiff, claiming that they were relieved from any further payments on account of the purchase price agreed to be paid for said mine, but plaintiff refused to accept surrender of said mining property, and demanded that the defendants keep and perform their said agreement for the purchase of the said mine and pay to plaintiff the remaining portion of said purchase price, to wit, the sum of $19,500, which said sum, or any part thereof, defendants refused to pay; that plaintiff has fully kept and performed all the conditions of the agreement on his part, and, ever since the making of said agreement, has been able, ready and willing, and is now ready, able and willing, to cause delivery of said deed to be made to said defendants upon the payment to him of the purchase price of said mining property. It was also alleged in the complaint and found by the court that the said mine is a gravel mine operating through shafts, drifts and tunnels run from the surface, and to prevent injury thereto it is necessary that the same be drained and kept drained, the tunnels and drifts to be timbered and kept timbered and in proper repair, and the mine drained and

kept free from water, and that unless such care is given the said mine, it will be destroyed and great and irreparable injury and damages will be done thereto.

The complaint also alleges that plaintiff has a lien upon the said property and the right to resort to the same in satisfaction of his said claims, and also avers that in order to preserve the said property a receiver should be appointed to take charge thereof. The court makes no findings upon these averments, and they seem not to have formed an issue in the case and need not be further noticed.

A general and special demurrer to the complaint was overruled and defendants filed an amended answer denying many of the averments of the complaint, but admitting the execution by said King of the contract set forth in the complaint and its assignment to defendants; they aver that they took no part in the negotiations relating to the contract of purchase and took possession only as the assignee of said King, "and with the understanding that the same was a bare option giving them the right to purchase the said property upon the payment of the purchase price as mentioned therein, and subject only to the condition that if the purchase price was not paid as therein provided, that they should have to surrender the possession of the said property and forfeit all rights thereto and all payments theretofore made; and that they never, at any time, promised to pay any part of said purchase price or to become indebted to said plaintiff in any sum of money whatever." They also allege that they were led to believe by plaintiff himself that said contract was a mere option and contained no personal obligation to pay any part of said purchase price except as a condition of the getting of a deed, and then only at the option of the holder, and that plaintiff has always treated the same as a mere option. They deny that the said King entered into said contract as the representative of said defendants, or either of them. They deny that they notified plaintiff of their exercise of the option to purchase said mine, and allege that they merely took possession of said property under the assignment of said contract, and paid the sum of $10,000 in accordance with its terms. The court found the foregoing averments of the answer to be untrue. The answer sets forth the escrow agreement and avers that the deed therein referred

to was not to be regarded as the deed of plaintiff, and was not to be delivered to defendants "unless they should exercise their option to pay the balance of said purchase price, and that said deed never was made or executed to these defendants, or either of them, and that it was always understood that the forfeiture provided in said contract was the only recourse which said plaintiff should have against these defendants, or either of them"; and upon this construction of the escrow agreement it is denied that plaintiff, in compliance with the demand of defendants, or either of them, executed the deed referred to in the complaint. This escrow agreement is dated May 18, 1907, executed by plaintiff, and recites the delivery to the bank of a grant, bargain and sale deed by plaintiff and his wife to defendants, conveying certain property and mining claims therein described and directing the bank to hold the deed in escrow under instructions calling for all of the various payments, excepting the first installment, at the dates as mentioned in said contract of purchase and sale, and, upon payment of the same "you will deliver the said inclosed deed to said John J. Hickey and Charley Lamb or their assigns, upon their order." It recites also that these instructions were given pursuant to an agreement entered into between the plaintiff and King on April 29, 1907, which was thereafter assigned to defendants, and also in pursuance to the terms of a supplemental agreement of May 18th between plaintiff and defendants, in which it is recited that plaintiff has covenanted to convey good title to said properties and to have an abstract of title prepared by a law firm named on or before September 29, 1907; and it is provided that "if said abstracters should certify that the title to said property is clear in all respects, and on or before the said twenty-ninth day of September, 1907, the said sum of $6,500 is not paid to my account, or if any of the other installments are not paid as hereinbefore provided, the said inclosed deed is to be redelivered to me at my request; if, however, said abstracters certify that the title to said property is not clear, then said deed is to remain with your institution until a further order is made upon you, signed jointly by myself and John J. Hickey and Charley Lamb or their assigns." The court found against the defendants upon their averments as to the execution of the deed and the conditions

upon which it was executed, as defendants alleged to have understood it, and found the escrow instructions to be as set forth above.

The answer denies that the supplementary agreement of May 18, 1907, was as set forth in the complaint, and avers that such supplementary agreement was entered into by plaintiff and defendant Hickey, and it is set forth in the answer. It recites the contract between plaintiff and said King; that King has assigned his right and interest therein to the party of the second part (John J. Hickey) ; that party of the second part has this day paid to the first party the sum of $10,000 in accordance with the terms and conditions of said agreement, and states that "Whereas, the said party of the second part is desirous that all encumbrance of all kinds whatsoever shall be removed from the property and premises particularly described in the said agreement: Now, therefore, in consideration of the premises and of the payment of the sum of $10,000 as hereinbefore provided, the said party of the first part · agrees to remove all of said encumbrances against the said Reed Drift mine in said annexed agreement particularly described, on or before the 29th day of September, 1907, the date of the payment of the second installment of said purchase price, and in the event that all of said encumbrances are not removed on or before the 29th day of September, 1908, then the said party of the second part hereto shall not be obligated to pay the said second installment on said date and shall not be required to pay said second installment or any future installment of said purchase price and in the event that all of said encumbrances are not removed on or before the 29th day of September, 1907, then the said party of the second part hereto shall not be obligated to pay said second installment on said date and shall not be required to pay said second installment or any future installment of said purchase price until the title to said herein described property and premises is absolutely clear of all encumbrances whatsoever." It is then averred in the answer that at the time of the execution of this supplementary agreement the plaintiff stated "that he would remove the encumbrances so that in case that said defendants exercised the option of making any future payment the property would be free and clear from such encumbrances, and promised that the option for making

any future payments would be extended until such time as
such encumbrances were removed, and to put the matter be-
yond question promised to put the same in writing, where-
upon the said instrument was executed and at the time that it
was executed it was understood between all parties thereto
that the same was not to add any condition whatever to the
said original contract of said 29th day of April, 1907, set
out in said complaint, but was merely to be an extension of
the time within which said defendants might exercise the
option to make any future payments, and in so far as the
said instrument as written includes any further promise or
condition, if it be construed to contain such, it was entered
into by mutual mistake of said parties thereto and was not
intended to be such, and it was so understood by said plain-
tiff and said defendants, and it was never understood by any
of the parties to said agreements that any of said payments
should be binding upon said defendants or either of them
but that each payment was to be made or not at their option,
and that said instrument last mentioned and said contract
set out in said complaint were not intended to be a contract
of purchase at all but merely an option, as aforesaid, and that
said plaintiff during all of the negotiations pending the exe-
cution of said instruments led defendants and each of them
to believe that the same was an option.''

The finding of the court is squarely against the aforesaid
averments as to the supplemental agreement and as to the
understanding between the parties, and the court finds that
there was no mutual or other mistake made by the parties
in reference to said supplemental contract.

It is also averred in the answer that plaintiff was a lawyer,
and defendants relied upon his knowledge of said matters
and upon his said representations in respect to the construc-
tion to be placed upon said instruments and each of them.
The court found that plaintiff was a lawyer, but that it was
not true as to the other of these averments.

The findings of the court have support in the evidence, from
which it appeared: That said King was known by plaintiff
and defendants to be a mining promoter, and that in ob-
taining the contract in question he was acting for defendants,
who were partners in the enterprise, each acting for both,
and was in fact to receive compensation for his services from

13 Cal. App.—10

both plaintiff and defendants. On April 21, 1907, King first spoke to plaintiff about having defendants in view as possible purchasers of the property, if sufficient time was given to prospect it, and plaintiff then gave King a written memorandum in which he stated: "If on next Friday, April 26, 1907, Joseph King, with a Mr. Lamb, will visit the Reed mine, that I will agree to sell the latter the said property at the agreed price of $36,000 and this offer to hold good for ten days after said Lamb appears upon the ground," to which was attached a further memorandum to the effect that if King effected a sale, he would be "entitled to a commission of ten per cent pro rata on payments of said purchase price as made." Some time before this King had met defendant Lamb at Stockton and informed him of the property and that plaintiff would give a sixty day option for prospecting. Lamb said he would see his partner (admittedly defendant Hickey), and a short time thereafter and prior to April 29, 1907, both defendants visited the mine and commenced prospecting. King and defendants had an understanding prior to the making of the contract of April 29th, as to its disposition when made, and King's compensation by defendants for obtaining it was agreed to, and was later reduced to writing by which they were to pay him five per cent on the purchase price of $36,000. It appeared that the day following the execution of the contract defendant Hickey made objection to certain words relating to the removal of machinery put upon the property by defendants and they were erased. From the time defendants went upon the property, prior to April 29th and until May 18, 1907, they continued to investigate and prospect the mine at their own expense. During this time plaintiff was working the mine and had developed better paying gravel, and was taking out from one to two thousand dollars per week, which was known to defendants. Without waiting the sixty days given in the contract for prospecting the mine defendants informed plaintiff, on May 18th, that they held the contract and were "ready to do business." Hickey and King met at the office of defendants' attorney, Hancock, on May 18th, and plaintiff was present. Plaintiff testified that Hickey and Hancock said "they were ready to buy the mine, make the purchase. Mr. Hancock requested me to sign a deed. Mr. Hancock said the parties—that Mr. Hickey, before

they would accept it, would expect a good title to the mine and that he wanted time to prepare it and that he would arrange it.'' The mine was encumbered at the time and defendants wanted the title cleared on or before the next payment. Mr. Hancock prepared the deed, the so-called supplementary agreement of May 18th to clear the property of debt and also the escrow instructions mentioned in the pleadings, and plaintiff executed the documents as agreed upon, and he subsequently paid off the encumbrances and cleared up the title and deposited the abstract in the Bank of California, as required of him, showing the title to be clear. On May 18th, when the matters just mentioned were concluded, defendants paid the first installment of $10,000; plaintiff cleaned up his mill and workings and surrendered full possession to defendants, who commenced at once mining operations at the point where plaintiff had been working, and as shown by their books, defendants took out of the mine the sum found by the court ($33,540.55) and appropriated it to their own use; they continued working the mine and on September 28, 1907, paid the second installment of the purchase price. The third installment fell due December 29, 1907, but at defendants' request an extension of the time in which to make this payment was given them, and plaintiff and defendants entered into a written agreement extending the time to January 28, 1908, changing the paragraph of the original contract to read: ''Third: six thousand five hundred (6500) dollars to be paid on or before the 28th day of January, 1908.'' On January 28, 1908, defendants notified plaintiff in writing in which they said: ''We hereby give you notice that on this 28th day of December, 1907, we surrender and give up and do hereby deliver to you possession of your property,'' etc. Plaintiff replied, refusing to accept the surrender of the property and demanding payment of the unpaid amounts due. So far as appears, defendants at no time until January 28, 1908, claimed that they were holding the property under a mere option to purchase.

Respondent claims that the contract of April 29th was one of sale and purchase, and while it gave defendants an option for a definite time and specific purpose, to wit, sixty days in which to prospect and determine whether they would purchase, that upon the acceptance of the offer of sale thereby

made to defendants, the payment by them of the first install-
ment of the purchase price, entry into possession of the prop-
erty after demand for the execution and delivery in escrow
of a good and sufficient deed, it ceased to be a mere option,
and became and continued to be a valid binding contract,
obligatory according to its terms, upon both parties thereto,
and that plaintiff, having fully performed on his part, has
his action for the unpaid purchase price of his property.

The judgment of the court was that plaintiff recover from
defendants the sum of $19,500 and costs of suit, and that on
payment thereof to plaintiff "defendants shall be entitled
to have and receive from the Bank of California the deed
placed with said bank in escrow by plaintiff as in the findings
herein set forth."

It seems to us free from doubt that the findings and judg-
ment are fully sustained by the evidence and that respond-
ent's view of the contract is correct.

Appellants contend that the contract was a continuing op-
tion which was renewed as each payment was made and con-
tinued until the next payment. We cannot agree to this
interpretation of the contract. By its terms the option was
limited to sixty days, during which time the vendees had the
right only to prospect the mine at a particular point, but any
gold taken out was to belong to the vendor. When, however,
the vendees became satisfied, as they appear to have been from
the results of the vendor's working of the mine during the
continuance of the option period, that they preferred to work
the mine for profit rather than be confined to prospecting it,
they changed their attitude as prospectors and became
operators and workers of the mine; they ceased prospecting
at the point designated; announced their intention to pur-
chase; paid the first installment a month before it was due,
after requiring the vendor to cease mining and to surrender
full possession to them with the privilege of retaining all the
gold mined by them; and the evidence is that $20,000 was
taken out up to the time the second payment became due.
It is unreasonable to suppose that the vendor intended, when
he surrendered possession to the vendees, to permit them to
appropriate all the gold they might mine and yet not be
obligated to make the payments agreed to be made. Under
such a construction of the contract, the supplementary agree-

ment and the instructions as to the escrow, the vendees could have decided on September 28th not to take the mine, and without making the second payment could have retained the $20,000 taken out. We do not think that the contract compels or would reasonably warrant such a construction. The so-called supplemental agreement refers to the payments as to be made upon the "purchase price," and it provided that if the vendor failed to remove the encumbrances by a stated time, the vendees should "not be obliged to pay the said second installment . . . or any future installment of said purchase price until the title to said described property and premises is absolutely clear of all encumbrances whatsoever." The implication here is very strong that the vendees would be and were obligated to pay the installments as they became due if the title was made clear. And they so acted when the second installment fell due. Of course, the vendor could have made the improvident contract contended for by the vendees, but we do not think he so intended or that the contract made by him can reasonably be so construed. The "agreed purchase price" was expressly mentioned as $36,000, based upon a sixty day option in which to prospect the mine, and the agreement was "to sell and convey the said Reed mine to second party, at any time within sixty days . . . upon payments and conditions as follows." Nowhere in these conditions is any mention of an option, but throughout the contract the payments to be made are upon the "purchase price." Before the sixty days expired the vendees availed themselves of the right to purchase, and there is nothing in the record to show that they did so merely as optionees with a continuing right to buy or not to buy as they might elect. Their entire conduct, as well as that of the vendor, shows that they were acting as purchasers.

Appellants speak of the contract as unilateral, and for that reason not binding upon them to purchase. It does not follow that because plaintiff alone executed the contract it is not binding upon defendants. If the contract was an agreement to sell and not a mere option, as we think is true, and defendants went into possession and made payments under it, such acts were a sufficient acceptance of its terms and defendants became bound by it. (*Benson* v. *Shotwell,* 87 Cal. 49, 53, [25 Pac. 249].) Besides, defendants signed the so-

called supplemental agreement, i. e., defendant Hickey signed it for defendants, which evidenced a further acceptance of the contract of April 29th. Appellants cite *Gordon* v. *Swan*, 43 Cal. 564, as decisive of their contention. We do not so understand that case. The contract there was for the sale of the entire stock of a corporation to defendants. The contract recited that the corporation was the owner of a vein of copper ore; that the first parties were desirous of selling their respective shares; that the parties of the second part (defendants) were ''desirous of making improvements on the said mine, and erecting smelting works for the purpose of reducing the ores of said mine, and of eventually making a purchase of the shares of stock of the parties of the first part and of the mine, if the tests which they shall cause to be made prove satisfactory.'' The purchasers were to pay $50,000 at the end of six months from the date of the agreement and possession given and similarly two further payments of $50,000 at intervals of six months, failing in which they were to forfeit their improvements made in and about the mine, and thereupon first parties were to take peaceable possession. The court said: ''It cannot be claimed that it was the true import of the contract that this large sum of money was to be paid for a brief possession of the mine, or for the privilege of erecting furnaces and testing the value of the ore. . . . It seems to be clear, from the terms of the instrument, that the purchase should be at defendants' option. It recites that the defendants are desirous 'of eventually making a purchase of the shares of stock . . . and of the mine, *if the tests which they shall cause to be made prove satisfactory.*' '' In that case the defendants had a comparatively brief time in which to make a large outlay of money for the purpose of testing the mine, and their only right was to go into possession for that purpose. It was not possible in this character of mine to do this at a profit or to work the mine for profit. Had they made their test and at the end of six months informed the vendors of their intention to purchase and had paid the first installment of $50,000, we would have had a case somewhat similar to the present one and the conclusion of the court might have been different.

Some suggestion is made by defendants that because of their breach of the contract they could not have enforced its

specific performance, and hence its mutuality was destroyed. We see no merit in this contention. Mutuality of contract does not require the same remedies under it. Defendants could not by their depriving themselves of the right to specific performance take from plaintiff his right to recover the unpaid amounts due under the contract. Where both are bound by the agreement either may pursue such remedies, for its enforcement as are open to him and these need not be identical. Nor was plaintiff confined to his remedy of repossessing himself of his mine upon defendants' breach and after defendants may have extracted a large quantity of gold from it to its possible exhaustion. (*Wilcoxson* v. *Stitt,* 65 Cal. 596, [52 Am. Rep. 310, 4 Pac. 629]; *Brickell* v. *Atlas Assur. Co.,* 10 Cal. App. 17, [101 Pac. 16].)

Some alleged errors of law are called to our attention, but defendants say in their brief that "a decision on them favorable to appellants would be of but little avail should the court hold against appellants as to the construction of the agreement, for if it is held that the contract evidenced a promise to pay the balance of $19,500, such decision will end the case." For this reason "appellants do not seriously urge the objections."

The judgment and order are affirmed.

Hart, J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on April 29, 1910, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 26, 1910.